Karen L. Martinez (Bar No. # 7914)
Thomas M. Melton (Bar No. # 4999)
Lindsay S. McCarthy (Bar No. # 5216)
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
15 W. South Temple, Suite 1800
Salt Lake City, UT 84101
(801) 524-5796

FILED
U.S DISTRICT COURT

2007 SEP 24  A 9: 13

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIATECT INTERNATIONAL CORPORATION, DAVID H. ANDRUS, JAY W. DOWNS AND MICHAEL P. McQUADE.<br><br>Defendants. | **COMPLAINT**<br><br>Case: 2:07cv00709<br>Assigned To : Sam, David<br>Assign. Date : 9/24/2007<br>Description: SEC v. Diatect International et al |

## INTRODUCTION

Plaintiff, Securities and Exchange Commission ("Commission") for its complaint against

Diatect International Corporation ("Diatect"), David H. Andrus ("Andrus"), Jay W. Downs

("Downs") and Michael P. McQuade ("McQuade"), alleges as follows:

1.     Diatect was incorporated in California in 1979 and is headquartered in Heber

City, Utah. The company claims to be in the business of manufacturing and selling non-toxic

insecticide products composed of diatomaceous earth ("DE"). Diatect began filing annual and

periodic reports with the Commission in 1980. Diatect's common stock is registered with the

Commission pursuant to Section 12(g) of the Exchange Act and was quoted on the OTC Bulletin

Board until October 21, 2005, when it was removed for failing to keep current its filings with the Commission. The company's stock is now listed in the National Quotation System pink sheets and traded at $.05 on February 20, 2007.

2.       Beginning with the filing of a Form 10-KSB with the Commission for Diatect's year ended December 31, 2002, and continuing with the filing of its Form 10-QSB, for its quarter ended September 30, 2003, through the filing of its Form 10-QSB for its quarter ended September 30, 2004, Diatect materially overstated its assets, equity and, for certain periods, its revenues and net income, in violation of Generally Accepted Accounting Principals ("GAAP").

3.       Diatect should not have recorded a note receivable nor should it have reported income from the sale of mining claims to an LLC created by a director as the transaction lacked substance. The mining claims were essentially worthless and the director, McQuade, never had the intent or financial ability to cause the LLC to make payments on the note for the purported purchase. Diatect's recording of this transaction caused its financial statements to materially deviate from GAAP.

4.       Diatect's financial statements were also inaccurate because the company began to improperly recognize revenue in 2002 from the sale of DE insecticide product to chapters of the Future Farmers of America ("FFA"). The sale of product to the FFA chapters was improperly reported on the company's financial statements as a receivable and revenue at the time of shipment. The sales were consignment in nature. As a result, Diatect should have recorded the revenue upon receipt of payment from the purchasers. Because of these accounting errors, Diatect's financial statements materially deviated from GAAP.

2

5.      Diatect also failed to obtain reviews by independent auditors of interim financial statements for its quarters ended June 30 and September 30, 2004, in violation of the federal securities laws.

## STATUTES AND RULES ALLEGED TO HAVE BEEN VIOLATED

6.      Defendant Diatect has engaged and, unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business which constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Sections 10(b), 13(a) and 13(b)(2)(A) and (B) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(2)(A) and (B)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13].

7.      Defendants Andrus and Downs have engaged, and unless restrained and enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business which constitute violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1, 13b2-2 and 13a-14 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2 and 240.13a-14], and aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A) and (B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

8.      Defendant McQuade has engaged, and unless restrained and enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business which constitute violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 and 13b2-2 [17 C. F.R. §§ 240.10b-5 and 240.13b2-2], and aiding and abetting violations

of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]. In the alternative to direct violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C. F.R. § 240.10b-5], defendant McQuade has engaged, and unless restrained and enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business which constitute aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C. F.R. § 240.10b-5].

9.      Defendants' conduct occurred in connection with the purchase and sale of Diatect's securities.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d)(3), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(e) and 78aa].

11.     Defendants, directly or indirectly, have made use of the mails, means or instruments of transportation or communication in interstate commerce, or means or instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business described in this Complaint.

12.     Venue over this action is proper pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa].

13.     Certain of the transactions, acts, practices and courses of business constituting violations alleged herein occurred within the state of Utah. Diatect's headquarters is located in Heber City, Utah. Andrus, Downs and McQuade transacted business and entered into

4

agreements within the state of Utah. Moreover, all the defendants with the exception of McQuade reside or may be found within the District of Utah.

## **AUTHORITY FOR PROMULGATED RULES CITED HEREIN**

14. Plaintiff Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e)], to restrain and enjoin the defendants from engaging in, or aiding and abetting, the transactions, acts, practices and courses of business described herein which violate the federal securities laws, and transactions, acts, practices and courses of business of similar purport and object, to order defendants Andrus and Downs to disgorge gains, with prejudgment interest, from their sales of Diatect's securities, to impose civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(d)(3)] against Andrus, Downs and McQuade and to bar each of them from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## **DEFENDANTS**

15. Diatect International Corporation ("Diatect") is a California corporation headquartered in Heber City, Utah. Diatect produces and markets a variety of insecticides made from DE combined with pyrethrum, a natural chemical extract from flowers, which the company claims is not harmful to the environment.

16. David H. Andrus ("Andrus"), age 43, is a resident of Heber, Utah. In 2001, he was appointed vice-president, COO, and a member of the Board of Directors of Diatect. On October 28, 2004, Andrus became president, CEO, principal financial officer and chairman of

5

the board of Diatect. Although Andrus has no formal education in accounting he presently signs Diatect's filing with the Commission and certifies those filings as Diatect's principal financial officer.

17. Jay W. Downs ("Downs"), 61, lives in Midway, Utah. He joined Diatect as a member of the Board of Directors in 1999 and was subsequently appointed president, CEO and principal financial officer on September 30, 2001. During the relevant time period Downs signed certifications related to Diatect's filings with the Commission. Downs resigned from Diatect on October 28, 2004.

18. Michael P. McQuade ("McQuade"), 50, lives in Richmond, Virginia. He joined Diatect in 1995 as an outside director. McQuade currently operates a private dental practice. In 2000, the Virginia Board of Dentistry found that McQuade; improperly engaged in the practice of dentistry while under the influence of alcohol and drugs; failed to maintain a sanitary practice environment; performed unnecessary procedures; and to have billed the insurance companies for procedures not performed. McQuade's dental license was suspended until he completed a drug rehabilitation program. During the time he was in treatment, he resigned from the Board of Directors of Diatect. After completing the drug rehabilitation program McQuade was re-elected to Diatect's board in 2002 and served until March 21, 2006, at which time he resigned.

## BACKGROUND

19. In approximately September 2001 and continuing through the spring of 2003, Andrus coordinated, on behalf of Diatect, the acquisition of 83 unpatented mining leases from the Bureau of Land Management ("BLM"), for insecticidal-quality DE, located in Malheur County, Oregon. Diatect paid about $500 for the mining leases. Andrus, with the assistance of Downs and others, purportedly acquired the mining claims to expand Diatect's supply of

6

"environmental friendly" insecticidal-quality DE so the company could market it products to the big-box home and garden stores like Wal-Mart Stores, Inc. and The Home Depot, Inc.

20.     Prior to conducting business with Diatect, the big-box retailer's required the company to undergo a valuation review by Dun & Bradstreet ("D&B"), to insure that Diatect had the financial means to stand behind their products and grant customer returns, if needed. D&B's Salt Lake City representative told both Andrus and Downs that Diatect needed more assets on its balance sheet to overcome the large amount of accumulated liabilities incurred by the company in order to avoid a going concern qualification in their audit report. It became Andrus' and Downs's primary goal to make it appear that Diatect was financially strong and to eliminate the going concern qualification for its year ended 2003.

21.     In July 2003, Diatect provided its audit firm, Williams & Webster, P.S. ("Williams & Webster"), with a trial balance for its June 30, 2003 financial statements which stepped up the value of the company's DE mining claims from $940 (the amount Diatect paid for the leases over two years) to $34,584,940. Andrus arrived at this mine valuation of $34,584,940 based upon a report issued by a geologist, Peter Winn ("Winn"), who had looked at the same DE mining claims in 1991.

22.     Andrus justified recording the $34,584,940 on Diatect's balance sheet because the company was struggling to stay alive and "you need to fly everything up the flagpole once or twice" to see if the auditors will sign off on it. Within days of receiving the trial balance, John Webster, a partner of Williams & Webster, told Andrus and Downs that recording Diatect's DE mining claims at $34,584,940 was not in accordance with GAAP.

23.     Winn had never heard of Diatect nor had he authorized Andrus or Downs to use his 1991 report to value the DE mining claims. The report was, at best, only a "feasibility study"

7

based upon certain estimates along with the assumption that there was sufficient demand for additional DE in the marketplace. Winn told Downs in approximately 1995 or 1996 that the DE claims now under lease by Diatect were not worth developing economically.

24.     In addition, Diatect did not have the money nor the necessary state or federal environmental or mining permits to develop the DE mine.

### BOGUS SALE OF DIATECT'S MINE CLAIMS

25.     Andrus determined that Diatect could increase its assets, income and equity on its financial statements by selling its mining claims to an independent third party. Andrus understood that if the buyer would sign a promissory note evidencing the obligation, such a transaction could appear on Diatect's financial statements and eliminate the need for a going concern qualification.

26.     Diatect held a Board of Directors meeting on August 4, 2003. Minutes of this meeting indicate that Diatect's management valued the company's DE mining claims at approximately $34 million and that the sale of a 90% interest in exchange for a note receivable should be recorded as a $31,125,600 asset on its balance sheet and an equal amount as income on its statement of operations. These same board minutes authorized Andrus and Downs to sell 90% of the DE mining claims to Diatomaceous Earth Deposits of Virginia, LLC. ("Earth Deposits").

27.     Earth Deposits was incorporated by McQuade, a director of Diatect, on August 26, 2003 following his return home from the August 4, 2003 board meeting.

28.     McQuade would not agree to purchase the DE mining claims without consulting his attorney in Virginia, and not without creating a new corporation to be the buyer because he did not want any financial risk. McQuade had no background in mining. There was no

8

negotiation regarding the purchase price, McQuade's company was to pay 90% of the valuation in the geologist's report for the DE mining claims. Andrus and Downs simply told McQuade what the purchase price would be.

29. McQuade relied upon the oral representations of Andrus and Downs that Diatect had valid DE mining claims to sell and that the purchase price of $31,125,600 was fair. Andrus and Downs also provided McQuade with a copy of Winn's 1991 report. McQuade did not do any due diligence or get an appraisal of the DE mining claims because Andrus and Downs assured him that the mine purchase was a viable business opportunity and because McQuade was not personally liable for the obligations of his newly formed corporation making it a riskless transaction for McQuade.

30. On August 18, 2003, Downs signed Diatect's Form 8-K filed with the Commission. The filing announced that Diatect had received a Letter of Intent ("LOI"), dated August 12, 2003, from Earth Deposits agreeing to purchase 90% of Diatect's mining claims for $31,125,600. The LOI also stated that Diatect would receive annual payments of approximately $1.9 million beginning in September 2005. The sale of the mining claims to Earth Deposits was to be completed by September 15, 2003 after Earth Deposits completed its due diligence review. On August 13, 2003, Diatect issued a press release to the PR newswire service which contained the same representations as in the Form 8-K.

31. The claim that Earth Deposits was going to conduct a due diligence review of the transaction was false.

32. Downs drafted the LOI and told McQuade to copy the text onto Earth Deposits' letterhead, sign it, and return it to him. Downs told McQuade that the LOI was needed for "documentation" purposes.

9

33.     On September 10, 2003, Diatect and Earth Deposits entered into a Sale and Purchase Agreement ("Agreement") that was prepared by Andrus and Downs. In addition to the terms contained in the LOI, the Agreement required Earth Deposits to sign a promissory note ("note") formally acknowledging its obligation to pay Diatect $31,125,600 for a 90% interest in the company's DE mining claims. The note required the $31,125,600 to be paid in full by September 1, 2021, together with interest on the unpaid principal at the rate of 8% per year.

34.     The Agreement also required Earth Deposits to put the mine into production, and among other things: a) provide Diatect claim development reports twice a year; b) provide Diatect copies of Earth Deposits' books and records, including financial statements, which show income and cash flows from its marketing of DE products on a quarterly and annual basis; c) pay profit royalties to Diatect generated by sales of DE by Earth Deposits' marketing efforts; and d) provide DE product to Diatect at a discount and fill Diatect's DE orders for product on a priority basis over other customers.

35.     Earth Deposits also represented in the Agreement that it had sufficient funds to capitalize, develop and operate the DE mine and that it had all the necessary environmental permits and licenses to conduct mining operations required by federal and state environmental regulators. Those statements were false.

36.     McQuade knew that Diatect would record the transaction with Earth Deposits as a sale on its financial statements. While the express terms of the Agreement required Earth Deposits to operate and put the mine into production, McQuade never intended to do so and told Andrus and Downs this. McQuade's motive for signing the agreement was to find another individual or entity to buy the DE mining claims so he could make a sales commission of up to 10% of that sales price.

10

37. McQuade did not have sufficient funds to develop the mine, nor did he have a business or mine operation plan or even so much as a checking account in the name of Earth Deposits. The purpose of creating Earth Deposits was to allow McQuade to avoid any personal financial risk regarding the purchase of the DE mining claims.

38. Andrus and Downs knew Earth Deposits lacked the finances to mine the DE claims. In fact, Andrus and Downs told McQuade that Diatect would not attempt to collect on the note from Earth Deposits because they were looking to a future buyer of the mine to pay the $31,125,600 note.

39. Neither McQuade nor Diatect management reasonably believed Earth Deposits would pay the note or adhere to any other terms of the Sale and Purchase Agreement.

## IMPROPER ACCOUNTING OF DIATECT'S MINE SALE IN COMMISSION FILINGS

40. Soon after McQuade signed the Agreement and note, Diatect reported the mine sale transaction, including having recorded income and a note receivable, in its financial statements contained in its September 30, 2003 Form 10-QSB that was filed with the Commission. During the preparation of this filing, Andrus and Downs argued repeatedly with Diatect's auditors, Williams & Webster, because the auditors questioned whether it was proper to record this transaction.

41. In an attempt to convince Williams & Webster to accept the twelve year old geologist's reported value of $34,584,000 for purposes of valuing the sale transaction, Andrus provided them with a document titled "Letter of Appraisal" ("letter"), dated June 24, 1996, authored by a geologist named Leonard J. Ettinger ("Ettinger"). This letter was provided to Williams & Webster only four days before the September 30, 2003 10-QSB was filed with the Commission. Andrus wanted to "flood" Williams & Webster with paperwork in an attempt to

11

back up Winn's report. Ettinger's letter stated that Ettinger was hired in 1996 to review Winn's report regarding the tonnage and grade of the DE reserves. Ettinger's letter concluded that based upon Winn's assumptions, the DE mine reserves would be worth approximately $34,584,000.

42.     However, Ettinger used Winn's exact figures and assumptions because Ettinger is not an expert in calculating the value of mining claims. Ettinger never spoke to anyone at Diatect or anyone associated with the company. Moreover, Ettinger's analysis would not have been valid at the time of the sale to Earth Deposits because more than ten years had passed since the date of Winn's report. Ettinger simply took Winn's mine value figure and put it in his 1996 letter based on his gut feeling rather than doing any independent work.

43.     Williams & Webster eventually persuaded Diatect to agree to a 50% discount in the recorded amount for the note and income, down from $31,125,600 to $15,562,800. Williams & Webster's audit work papers state that because of the substantial risks associated with Earth Deposits fulfilling the terms and conditions of the note, it was their judgment that a 50% discount was reasonable at that time.

44.     At the time of the December 2003 year end audit, Earth Deposits was a newly created LLC and had no operating history or financial statements; there was no evidence that Earth Deposits nor McQuade, individually, had the financial ability to open or operate a mine; no payments were due on the note by Earth Deposits for two years and no down payment to buy the mine had been made by Earth Deposits; McQuade had no mining experience; and Earth Deposits had not obtained the necessary federal or state permits to operate a mine.

45.     Diatect initially filed its Form 10-KSB for 2003 with the Commission on April 14, 2004. However, this filing was amended on April 29, 2004 because the company failed to include

12

Williams & Webster's audit report in the original filing. The April 29, 2004 Form 10-KSB/A included Williams & Webster's audit report, which did not contain a going concern qualification.

46.     In addition, in item 12 of the Form 10-KSB/A, the company disclosed that on December 31, 2003 management conducted an impairment test and business risk analysis of the note. As a result of its risk analysis, Diatect established a reserve allowance of $3,562,800, which further reduced the book value of the note from $15,562,800 to $12,000,000. Despite the additional write-down of the note, the transaction still had the effect of increasing Diatect's total assets, income and equity by $12,000,000 for the year. The note accounted for over 90% of Diatect's total assets and the income from the transaction amounted to more than 100% of its net income and was material to Diatect's financial statements.

47.     As part of Williams & Webster's audit procedures on Diatect's 2003 financial statements, Diatect provided McQuade with a confirmation, asking him to confirm the amount of the Earth Deposits note for the purchase of the mine. McQuade received the confirmation on March 18, 2004. The confirmation indicated that the face value of the note was $15,562,800 instead of $31,125,600 as stated on the note.

48.     McQuade signed and returned the confirmation without inquiring as to the change in the note's value. If Diatect sent McQuade a document that required his signature, he would simply sign it between patients as he was a "very busy dentist" and he trusted Andrus and Downs to make sure the paperwork was done right.

49.     McQuade's failure to observe the reduced value and his failure to determine how and why Earth Deposits note was written-down by 50% was reckless and a failure to uphold his fiduciary duty to the public shareholders as a director of Diatect.

13

50.     Andrus provided additional documentation to Williams & Webster regarding Earth
Deposits ability to pay the note. Andrus sent Williams & Webster a letter dated March 29, 2004. In
this letter, Andrus claimed that McQuade was qualified to buy and operate the mine because of his
experience in conducting wildcat oil exploration in Texas; having developed timber operations and
having managed real estate developments. Andrus also stated that McQuade was expanding his
dental practice by hiring additional staff which would allow him more time and money to develop
the mine. Andrus wrote that McQuade had the ability to attract financial partners, if needed,
because of his contacts in the medical and real estate fields. In addition, the letter stated that the
annual note payments would be met easily by Earth Deposits once the mine was operational
because of the large market for DE.

51.     McQuade was provided a copy of Andrus' March 29, 2004 to Williams &
Webster. McQuade was shocked by the letter's contents. McQuade had never been involved in
wildcat oil exploration in Texas; had not participated in the timber business and was not a real
estate developer. McQuade lacked the ability to attract financial partners as Andrus claimed in
the letter.

52.     On April 5, 2004, Andrus authored another letter to Williams & Webster in which
he asserted that Diatect has no business risk related to the note because if Earth Deposits defaulted,
the mine would revert to Diatect under the terms of the Agreement. Moreover, Andrus represented
that Earth Deposits was doing significant work with a team this season to develop the mine plan and
strategy. Andrus also referred Williams & Webster to Winn and Ettinger's reports as evidence of
the true value of the mine property. Neither Winn nor Ettinger were contacted by Diatect or the
auditors even though their reports formed the basis for the mine's valuation and were at least 12 and
8 years old respectively.

14

53.     McQuade also reviewed a copy of the April 5, 2004 letter Andrus provided to
Williams & Webster.  Contrary to Andrus' representations no significant work was being done
on the mine property.

54.     Later, on April 9, 2004, Downs wrote to Williams & Webster alleging Earth
Deposits had the financial wherewithal to support the mine sale transaction and the ability to
generate income to pay off the note by either operating the mine or selling the mine.  Downs
claimed that the payments due from Earth Deposits under the terms of the note were not dependant
on the future operations of the mine.  Downs also stated that even though Earth Deposits is a new
entity, it had engaged professionals in the industry to conduct testing, market, and production
analysis on the mine property.  Downs also represented that no down payment for the purchase of
the mine was necessary as Earth Deposits was going to expend a large amount of money in opening
the mine.  Those representations were false.

55.     McQuade never told anyone that he had the "financial stature" to fund the
operations of the mine and that such a representation was false.  Furthermore, McQuade knew of
no one who was interested in buying the mine from Earth Deposits and he had no intention of
operating it.  McQuade had not contacted any professionals to assist him in conducting testing or
doing market analysis for DE at the mine until the summer of 2004, months after Downs wrote
the letter.

56.     No one from Williams & Webster contacted McQuade to verify the accuracy of
the representations made in the letters written by Andrus and Downs.

57.     Andrus knew the mine sale transaction was a sham.  Andrus admitted the mine
sale transaction "didn't sit well, but if you get a $7 million or $8 million contract with Wal-Mart,
who cared?"  Andrus regarded the propriety of recording the mine sale by agreeing that his

15

attitude was "the end would justify the means." Andrus knew McQuade never intended to operate the mine or make payments on the note because McQuade told him exactly that.

58.     Likewise, Downs knew the sale was a sham transaction. He knew McQuade never intended to operate the mine or make any payments on the note because McQuade told him so.

59.     Diatect terminated its relationship with Williams & Webster in early 2005 after Williams & Webster failed to review Diatect's second and third quarter Form 10-QSBs for 2004.

60.     In a Form 8-K filed with the Commission on March 1, 2005, Diatect announced that it engaged Hansen, Barnett & Maxwell ("HBM"), as their new independent auditors, as of February 14, 2005.

61.     HBM re-audited and re-stated Diatect's 2003 financial statements which were included in a From 10-KSB filed with the Commission on April 18, 2005 for its year ended 2004. This restatement included the removal of the $12,000,000, previously shown as a note receivable on Diatect's balance sheet, and in its statement of operations as a gain from the sale of the mining property. Notes to these financial statements disclose that the company considered the Agreement to be non-substantive, as the buyer was thinly capitalized and had only made minimal investments in the property.

62.     Recording the mine sales transactions on Diatect's books and records violated GAAP because McQuade made no significant financial investment in the business down payment and the repayment of debt was dependent on future successful operations of the business.

63.     In the mine property transaction, McQuade made no cash down payment, no payment was due for two years, there was no personal guarantee by the owner of Earth Deposits,

16

and there was no financial substance to Earth Deposits, which was a newly formed entity with no operating history, no experience in mineral extraction, no business plan and not so much as a checking account at a financial institution.

64.     Since, Diatect had previously been advised that the mine property had little if any value and the buyer had no intention of operating the mine, Diatect was not divorced from the risks of ownership and was anything but assured of collecting the sales price. Therefore, accounting for the transaction as a divestiture would not reflect the economic substance of the transaction and would not be appropriate under GAAP.

65.     Through the conduct of Andrus, Downs and McQuade, the Agreement and note were used to mislead investors and shareholders of the company into believing that the note receivable from Earth Deposits was a valuable asset and that Diatect had realized a huge profit from the sale of the mine claims.

66.     Despite their knowledge that the mine would never be put into production and had little value, Diatect management continued to allow the note receivable, and a purported gain from the mine claim sale, to be improperly recorded as an asset, income, and as an addition to equity on the company's financial statements for the third quarter and year ended 2003, and as an asset and an addition to equity for the first three quarters of 2004.

67.     Reporting the mine sale transaction caused total assets on Diatect's balance sheets, included in five periodic filings with the Commission, to be overstated by between 281% and 375%, caused the appearance of positive stockholders equity on each of those balance sheets when in fact they should have reflected a deficit, and caused Diatect's statement of operations to be changed from a net loss of $777,833 to net income of $14,784,967 for its quarter ended September 30, 2003, and to be changed from a net loss of $4,475,946 to net income of

17

$7,524,054 for its year ended December 31, 2003. Therefore, allowing the mine sale to be recorded on the Diatect's financial statements was contrary to GAAP and caused its financial statements to be materially false and misleading.

## IMPROPER REVENUE RECOGNITION BY DIATECT

68.     During 2002, Diatect entered into approximately 118 contracts to provide DE product to various Texas high school chapters of the FFA. These FFA chapters were to sell Diatect's DE products as a fundraising program called "Got Bugs Fundraiser" to help support their chapter's projects.

69.     According to the contract and promotional material provided to the FFA chapters by Diatect, the company claimed the "Got Bugs Fundraiser" was a "profitable" and "risk free" program. The promotional materials also stated that the FFA chapters would not have any out of pocket expenses associated with having Diatect's DE product shipped to them, and that each chapter would only be required to pay Diatect if and when they sold the product. Moreover, the FFA chapters had an unlimited right to return the DE product to Diatect at anytime provided the chapter paid for the return shipping costs.

70.     Diatect improperly recognized revenue in its financial statements contained in its 2002 Form 10-KSB by recording these consignment transactions as sales at the time the product was shipped. Reported revenues in Diatect's 2002 Form 10-KSB were $769,600. Total DE product sold to the FFA chapters for 2002 was $273,558, of which $203,422 was returned. Consequently, Diatect's 2002 revenue figure was overstated by about 36%. A note to the financial statements contained in Diatect's 2002 and 2003 Form 10-KSBs states that revenues from sales of product are recognized when the product is shipped and that the customer can return product at anytime provided they pay the return shipping fees.

71.     Diatect recorded a sale to the FFA chapters once the product was shipped. This practice deviated from GAAP because the FFA chapters had the right to return product and they had no obligation to pay for the product until it was resold. Andrus and Down were informed by Diatect's bookkeeper that recognition of revenue at the time of shipment violated GAAP. Andrus and Downs ignored the bookkeeper's concern.

72.     On November 20, 2003, a new bookkeeper was hired by Diatect. The new bookkeeper agreed that the sales to the FFA chapters appeared to be a consignment arrangement because no payment was due until the FFA chapters resold the product and the FFA chapters had the right to return the product at anytime. Andrus refused to set up a return allowance and adamantly denied that a consignment relationship existed between Diatect and the FFA chapters. The FAA fundraising program was a "scam" to create revenues so that Diatect appeared to be financially viable.

73.     Diatect's recording of revenue from the purported sales to the FAA chapters
•
deviated from GAAP because the obligation of the FFA chapters to pay Diatech was contingent on the resale of the product and the amount of future returns was not reasonably estimateable.

74.     Under the terms of the contract and promotional material for the "Got Bug Fundraiser" provided to the FFA chapters by Diatect, the chapters were not obligated to pay Diatect for the sale of any DE product until it was resold to an end user, and Diatect had no history with the program to reasonably estimate returns. Therefore, Diatect and its management improperly recognized revenue causing its financial statements contained in its year ended 2002 Form 10-KSB to be materially false and misleading.

19

## DIATECT FAILED TO HAVE THE FINANCIAL STATEMENTS CONTAINED IN JUNE AND SEPTEMBER 2004 FORM 10-QSBS REVIEWED BY AN INDEPENDENT PUBLIC ACCOUNTANT

75.     Diatect failed to have the financial statements contained in its second and third quarter Form 10-QSB's for 2004 reviewed by independent accountants, as required by Rule 10-01(d) of Regulation S-X. Downs signed the certifications for the June 30, 2004 Form 10-QSB. Likewise, Andrus signed the certifications for the September 30, 2004 Form 10-QSB.

76.     Andrus knew it was improper to submit the filing without a review but he felt justified in doing so because Williams & Webster was holding Diatect "hostage" for money owed to the firm for professional services.

77.     Andrus never considered contacting the Division of Corporation Finance and explaining to them the situation regarding Williams & Webster, and disclosing the problems the company was having in obtaining the required review.

78.     On August 16, 2004, Williams & Webster provided a letter to Downs in which Williams' states that within the past hour the firm learned for the first time that Diatect had filed its June 30, 2004 Form 10-QSB without their review. Williams had previously advised Downs to file an extension requesting additional time to file the Form 10-QSB. Downs did not request an extension.

79.     On November 8, 2004, Williams sent a letter to Andrus informing him that Diatect was in violation of the Federal Securities Laws for failing to have financial statements contained in its June 2004 Form 10-QSB reviewed by an independent accountant.

80.     Despite these facts, Andrus knowingly filed the September 30, 2004 Form 10-QSB without the required independent auditor's review.

## ANDRUS AND DOWNS SALES OF DIATECT STOCK

81.     From August 12, 2003 through April 18, 2005, the time period in which the false and misleading information regarding the bogus mine sale transaction was disclosed in Diatect's filings, Andrus and Downs sold Diatect stock.

82.     Andrus sold 1,735,457 shares of Diatect stock between August 12, 2003 and April 18, 2005 realizing $150,205.88.

83.     Downs sold 1,519,600 shares of Diatect stock between August 12, 2003 and April 18, 2005 realizing $94,758.87.

### FIRST CAUSE OF ACTION

### EMPLOYMENT OF DEVICE, SCHEME, OR ARTIFICE TO DEFRAUD

**Diatect, Andrus, and Downs' Violations of Sections 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)]**

84.     Plaintiff Commission repeats and realleges Paragraphs 1 through 83 above.

85.     Defendants Diatect, Andrus, and Downs, and each of them, by engaging in the conduct described in paragraphs 1 through 83 above, directly and indirectly in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails, with scienter, employed devices, schemes, or artifices to defraud.

86.     By reason of the foregoing, defendants, Diatect, Andrus, and Downs, directly or indirectly, violated, and unless restrained and enjoined will continue to violate 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

21

## SECOND CAUSE OF ACTION

## FRAUD IN THE OFFER AND SALE OF SECURITIES

### Diatect, Andrus and Downs' Violations of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)]

87.     Paragraphs 1 through 83 are realleged and incorporated herein by reference.

88.     Defendants Diatect, Andrus, and Downs, and each of them, by engaging in the conduct described in paragraphs 1 through 83, directly and indirectly, in the offer and sale of securities of Diatect, by the use of means or instruments of transportation or communication in interstate commerce or of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of such securities.

89.     By reason of the forgoing, defendants Diatect, Andrus, and Downs, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

## THIRD CAUSE OF ACTION

## FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES

### Diatect, Andrus, Downs and McQuade's Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

90.     Paragraphs 1 through 83 are realleged and incorporated herein by reference.

91.     Defendants, Diatect, Andrus, Downs and McQuade by engaging in the conduct described in paragraphs 1 through 83 above, directly or indirectly, in connection with the

purchase and sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly, with scienter: (1) employed devices, schemes or artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

92.     By reason of the foregoing, defendants Diatect, Andrus, Downs and McQuade, directly or indirectly, violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

93.     Alternatively, by reason of the foregoing, defendant McQuade aided and abetted violations of Section 10(b) and Rule 10b-5 thereunder, by knowingly and substantially assisting Diatect, Andrus and Downs' direct violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and unless restrained and enjoined, McQuade will continue to aid and abet violations Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### FOURTH CAUSE OF ACTION

### FALSE FILINGS WITH THE COMMISSION

**Diatect's Violations of Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] promulgated thereunder**

94.     Paragraphs 1 through 83 are hereby realleged and incorporated by reference herein.

95.     Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder require companies filing registration statements and periodic

reports with the Commission to file truthful reports that do not omit information and otherwise make the information contained in the filings not misleading, to keep books and records which accurately and fairly reflect the disposition of assets, and to devise a system of internal controls sufficient to provide reasonable assurance that transactions are properly recorded.

96.     Diatect violated Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 by filing materially misleading Forms 10-KSB for the years ended December 31, 2002 and 2003 and Forms 10-QSB for the quarters ended September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004, by failing to keep accurate books and records. In each of the quarterly and annual filings, Diatect overstated assets and/or revenue, income and equity.

97.     Diatect's filings with the Commission were materially inaccurate and contained misstatements and omissions in that, among other things:

(a)     The financial statements accompanying Diatect's filings improperly reported a note receivable and income from the sale of its DE mining claims to a director of the company when both parties to the transaction knew the buyer had no intent or financial ability to make payments on the note.

(b)     Diatect's financial statements were also inaccurate because the company improperly recognized revenue in 2002 from the sale of DE product to FFA chapters at the time of shipment when, in fact, the sales were consignment in nature and should only have been recorded as revenue upon receipt of payment from the purchasers.

(c)     Diatect did not keep accurate books and records or maintain a system of internal accounting controls that would provide reasonable assurances that transactions entered into by the company were reported correctly. Since Diatect did not recognize revenue, income and

24

equity properly on its books and records, the company could not prepare financial statements that complied with GAAP.

98.     As a result of the conduct set forth in paragraphs 1 through 83 above, Diatect directly and indirectly, violated Sections 13(a), 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §§78m(a), 78m(b)(2)(A) and (B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 13a-13] promulgated thereunder.

## FIFTH CAUSE OF ACTION

## AIDING AND ABETTING FALSE BOOKS AND RECORDS VIOLATIONS AND FALSE FILINGS

### Andrus, Downs and McQuade Aided and Abetted Diatect's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] promulgated thereunder

99.     Plaintiff Commission repeats and realleges Paragraphs 1 through 83 above.

100.    Aiding and abetting liability arises when there is: (1) a violation of the securities laws by some other party; (2) a general awareness by the aider and abettor that his role is part of an overall activity that was improper; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. Either willfulness or a reckless indifference to a known obligation or set of facts will satisfy the scienter requirement to held liable as an aider and abettor.

101.    Andrus, Downs and McQuade aided and abetted Diatect in violating Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 in that they knowing and recklessly assisted the company it recognizing revenue and income improperly in its quarterly and annual filings beginning with the year end 2002 through the thrid quarter in 2004.

102.    As officers and directors of a public company all three individuals knew that the main purpose in having Diatect enter into a bogus mine sale Agreement was to artificially inflate

25

the company's revenue, income and equity on its financial statements by approximately $31,125,600 which was subsequently reduced to $15,562,800. Their actions are particularly egregious since none of the parties to the sales transaction intended to honor the terms of the Agreement from the outset. None of the above information was disclosed in Diatect's filings with the Commission.

103.    In addition, Andrus and Downs knew based upon the agreements provided to the FFA chapters ("chapters") and being told by Diatect's own in-house bookkeepers that any product shipped to the chapters was done so on a consignment basis. Diatect's bookkeepers told Andrus and Downs that because the chapters had no obligation to pay Diatect for DE product until it was sold to an end-user, and because the chapters had the right to return product to Diatect at any time, such an arrangement qualified as a consignment business relationship between Diatect and the chapters. By ignoring the consignment nature of the business relationship between Diatect and the chapters, Andrus and Downs actions caused Diatect's revenues to be overstated and misrepresented the company's financial condition and operations in its filings with the Commission.

104.    McQuade rendered substantial assistance to Diatect's primary violation of its reporting provisions by signing an audit confirmation at the request of the company's accountants that his company, Earth Deposits, owed $15,562,800 as part of the sham mine sale transaction. McQuade showed a reckless indifference by failing to notify Diatect's auditor that Earth Deposits lacked the intent or ability to purchase the mining claims. Thereby, McQuade aided and abetted Diatect's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13.

## SIXTH CAUSE OF ACTION

## VIOLATIONS OF RECORDKEEPING AND INTERNAL CONTROL REQUIREMENTS

**Andrus and Downs violated Section 13(b)(5) of the Exchange Act and [15 U.S.C. §
78m(b)(5)] and Rule 13b2-1, [17 C.F.R. § 240.13b2-1] and aided and abetted Diatect's
violation of Sections 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)
and (B)] and Andrus, Downs and McQuade violated Rule 13b2-2 [17 C.F.R. § 240.13b2-]**

105.    Paragraphs 1 through 83 are hereby realleged and incorporated by reference
herein.

106.    Andrus and Downs violated section 13(b)(5) of the Exchange Act which provides
that "no person shall knowingly circumvent or knowingly fail to implement a system of internal
account controls or knowingly falsify any book, record, or account ..." described in Section
13(b)(2).

107.    Rule 13b2-1 requires Diatect to maintain and keep books, records and accounts
which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of
assets. Rule 13b2-1 also requires that a company's books and records not be falsified by any
person. Rule 13b2-2 prohibits any officer or director from making or causing any material false
or misleading statement to an accountant in connection with preparation of required reports and
documents.

108.    Section 13(b)(2)(A) of the Exchange Act requires companies to keep accurate
books, records and accounts which reflect fairly the transactions entered into by companies and
the disposition of its assets.

109.    Section 13(b)(2)(B) requires companies to devise and maintain a system of
internal accounting controls sufficient to provide reasonable assurances that transactions are
recorded as necessary to permit preparation of financial statements in conformity with generally

accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for such assets.

110.    Andrus and Downs violated Section 13(b)(5) of the Exchange Act by knowingly or recklessly falsifying the company's books, records, and accounts, and circumventing its system of internal controls. Andrus and Downs willingly participated in an illusory mine sale transaction which neither Diatect nor Earth Deposits intended to fulfill. The sole motive of the parties in entering into the mine sale transaction was to window-dress Diatect's financials to make it appear the company had significant revenue, income and equity. Andrus and Downs also instructed Diatect's in-house bookkeepers to ignore the consignment nature of the DE sales transaction with the FAA chapters and book sales as revenue at the time the product was shipped.

111.    Andrus and Downs by the improper entries they caused to be made in the books and records of Diatect, beginning with its year 2002 and continuing with the third quarter 2003 through the third quarter of 2004, as officers and/or directors, violated Rule 13b2-1 under the Exchange Act.

112.    Andrus, Downs and McQuade also directly violated Rule 13b2-2 by lying to Williams & Webster in connection with the audit of Diatect's financial statements for its years ended December 31, 2002 and 2003, and the review of its financial statements for its quarters ended September 30, 2003 and March 31, 2004. Andrus and Downs never disclosed to Williams & Webster that DE product purportedly "sold" to the FFA chapters was, in fact, done so on a consignment basis and lied to them about the nature of the mine sale.

113.    Andrus and Downs worked diligently to convince Williams & Webster that McQuade's company Earth Deposits was financially capable of fulfilling the terms of the note and

would put the mine into production. McQuade signed off on a confirmation that was false on its face and never disclosed to the auditors that he knew the mine sale Agreement would not be complied with. Furthermore, Andrus and Downs wrote letters to Williams & Webster in March and April 2004 falsely representing that McQuade had the knowledge and financial means to open and operate the DE mine.

114.    Andrus and Downs also lied to the auditors by claiming McQuade was currently engaged in developing a plan to open the mine and significant work on developing the DE claims was occurring on the property during the audit. Both individuals took an active role in deceiving the auditors into believing that Diatect was a company that was generating income from DE sales and would enjoy huge profits from the sale of an interest in the mine property to an LLC formed by a director who was capable of and going to develop that property. All such claims were false and misleading.

115.    Andrus and Downs also aided and abetted the primary violations by Diatect of Section 13(b)(2)(A) and (B) of the Exchange Act. Diatect violated these provisions in that its books and records contained materially false asset, revenue, income and equity entries. The inadequate books and records resulted directly from the company's failure to establish and maintain internal controls that would have permitted the preparation of financial statements that conformed to GAAP. By directly causing the company to violate this provision, Andrus and Downs rendered substantial assistance to Diatect in the commission of the primary violation. They certainly also had a general awareness that their role was part of an overall activity that was improper.

## SEVENTH CAUSE OF ACTION

### FALSE CERTIFICATIONS OF A QUARTERLY REPORT
### Andrus and Downs Violation of Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14]

116.   Paragraphs 1 through 83 are hereby realleged and incorporated by reference herein.

117.   Both Andrus and Downs violated the certification provisions of Rule 13a-14 under the Exchange Act. Downs signed the certifications regarding the financial statements included in the September 30, 2003 Form 10-QSB, the year-end 2003 Form 10-KSB and the 10-QSB's for the first two quarters in 2004. Andrus signed the certifications for the 10-QSB filed for Diatect's third quarter in 2004. In each certification, Downs and Andrus state this Form does not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." The certifications signed by Downs and Andrus were false.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the defendants committed the violations charged and alleged herein.

### II.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders permanently enjoining defendants Diatect, Andrus, and Downs and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them,

30

from engaging in the transactions, acts, practices and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## III.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders permanently enjoining defendant McQuade and his officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with him, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices and courses of business described herein, and from engaging in conduct of similar purport and object in violation of, or in the alternative aiding and abetting violations of, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## IV.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders permanently enjoining defendant Diatect, and its officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 13(a) and 13(b)(2)(A) and (B) of the Securities Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## V.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, an order permanently enjoining defendants Andrus, and Downs, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with

31

any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices and courses of business described herein, and from engaging in conduct of similar purport and object in aiding and abetting Diatect's violations of Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13.

## VI.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, an order permanently enjoining defendants Andrus and Downs, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 13(b)(5) of the Exchange Act and Rules 13b2-1, 13b2-2 and 13a-14.

## VII.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, an order permanently enjoining defendant McQuade, and his officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Rule 13b2-2 of the Exchange Act and from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-14.

## VIII.

Permanently bar defendants Andrus, Downs and McQuade from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, as amended [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## IX.

Enter an order directing defendants Andrus and Downs to disgorge all ill-gotten gains unjustly realized from their sales of Diatect stock made by them during the time of the violative conduct and pay prejudgment interest thereon.

## X.

Enter an order directing defendants Andrus, Downs and McQuade to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## XI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated this 21st day of September 2007.

Karen L. Martinez (Utah State Bar. No. 7914)
Thomas M. Melton (Utah State Bar. No. 4999)
Lindsay S. McCarthy (Utah State Bar No. 5216)
SECURITIES AND EXCHANGE COMMISSION
15 West South Temple Street, Suite 1800
Salt Lake City, Utah 84101